NOTICE
Decision filed 07/30/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250032-U

NO. 5-25-0032

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Gallatin County. |
| | ) | |
| v. | ) | No. 21-CF-15 |
| | ) | |
| CHRISTOPHER B. BAKER, | ) | Honorable |
| | ) | Thomas J. Foster, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE* delivered the judgment of the court.
Justices Sholar and Hackett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions for predatory criminal sexual assault of a child where the trial court did not abuse its discretion when it ruled that the out-of-court statements made by the minor victims were admissible.

¶ 2   Following a jury trial in the circuit court of Gallatin County, the defendant, Christopher B. Baker, was convicted of seven counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and was sentenced to life in prison. Defendant appeals, arguing that the trial court erred by admitting, as substantive evidence pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2020)), hearsay statements the

---

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has read the briefs.

1

two minor victims made to their mother and during their forensic interviews. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On April 27, 2021, the defendant was charged in Gallatin County, Illinois, with two counts of predatory criminal sexual assault of a child against J.E.P. and J.G.P., both under the age of 13 at the time of the offenses. 720 ILCS 5/11-1.40(a)(1) (West 2020). The State later amended the charges, charging additional counts of separate conduct against the defendant based on disclosures made by J.E.P. on February 15, 2023, at The Guardian Center Inc., a children's advocacy center (CAC). The charges were last amended on October 23, 2024, where the State charged the defendant with seven counts of predatory criminal sexual assault of a child, each for a separate act of sexual contact that the defendant, who was over the age of 17, allegedly committed against J.E.P. and J.G.P.

¶ 5      As it relates to J.E.P., the State alleged that when J.E.P. was under the age of 13, the defendant knowingly, and with the purpose of sexual gratification, committed four separate acts of sexual contact with her, whereby the defendant placed his penis in her vagina (counts I-IV). The State also alleged that when J.E.P. was under the age of 13, the defendant knowingly, and with the purpose of sexual gratification, committed two additional separate acts of sexual contact with J.E.P., in that the defendant placed his tongue on her vagina (count V) and placed his penis in her mouth (count VI). As it relates to J.G.P., the State alleged in count VII that when J.G.P. was under the age of 13, the defendant knowingly, and with the purpose of sexual gratification, committed an act of sexual contact with her whereby the defendant rubbed her vagina.

¶ 6      On April 18, 2022, the State filed a motion seeking to admit statements J.E.P. and J.G.P. made to their mother, Emily Roark, and the CAC forensic interviewer, Brandi Hankins-Hammond,

pursuant to the hearsay exception set forth in section 115-10 of the Code. On April 25, 2022, a hearing was held on the motion, and the State called Roark to testify. Roark testified that she is the mother of J.E.P. and J.G.P., who were under the age of 13. She explained that the defendant was a family friend, whom she had spent time with growing up, and who had spent time with J.E.P. and J.G.P. since they were born. Beginning when J.E.P. was around the age of one, the defendant began to babysit for Roark, and "[i]t started getting to the point where it was like every other weekend [J.E.P. and J.G.P.] would go and stay over" at the defendant's residence. Roark explained that things changed in February of 2020; J.E.P. and J.G.P. stopped wanting to stay the night at the defendant's residence; instead, they would go during the day and then wanted to be picked up at night.

¶ 7     On the night of April 5, 2020, Roark heard J.E.P. and J.G.P. whispering while they were in the bathtub. Roark believed something was wrong because J.E.P. and J.G.P. generally were more rambunctious during their baths, so she pulled back the halfway-open curtain and asked the girls what they were talking about. In response, J.G.P. said she was scared to tell Roark what they were talking about. To convince her children to answer her, Roark told J.E.P. and J.G.P. that she had already heard their conversation, so they needed to tell her what they were talking about. J.G.P. then disclosed that the defendant "puts his private parts on her private parts." J.E.P., in response to J.G.P.'s disclosure, stated, "He doesn't do that to me. He just does it to [J.G.P.]."

¶ 8     The following morning, Roark talked to J.E.P. alone and falsely told her that she had called the defendant and spoke to him about what J.G.P. had said. Roark told J.E.P. that the defendant told her what happened, and that she needed to tell Roark too. J.E.P. then disclosed that the defendant "would get her private part wet and his private part wet, and he would rub up against hers." J.E.P. explained to Roark that when the defendant would stop, "she would have to go in the

3

bathroom, and she would have to clean her stomach off *** because of the stuff that comes out." J.E.P. further described the substance as "sticky." When asked why J.E.P. did not tell Roark, J.E.P. said that the defendant told her that if she told Roark "she would never be allowed back over there again and that she would get in trouble." Roark further testified that J.E.P. and J.G.P. told her that the inappropriate contact with the defendant "happened quite a bit."

¶ 9 The State then called Hankins-Hammond, who testified that she conducted interviews with J.E.P. and J.G.P. at the CAC. Hankins-Hammond stated that J.G.P. told her that the defendant would "put his private part on her private part." After J.G.P. identified the "private parts" as the defendant's penis and her vagina, J.G.P. said that the inappropriate contact happened "many times" and expressed that the contact would hurt her vaginal area. Hankins-Hammond stated that J.E.P. told her that the defendant "did not kiss her on the mouth, but he did rub his private part against her private part." J.E.P. also identified the "private parts" as the defendant's penis and her vagina.

¶ 10 The State offered video recordings of both interviews as People's Exhibits 1 and 2. However, after assurances that the videos were consistent with Hankins-Hammond's testimony, and that the State intended to introduce the videos at trial, the court declined the exhibits for the purposes of the hearing. The trial court then found that the time, content, and circumstances of the statements both children made provided sufficient safeguards of reliability, but reserved ruling until the court could be sure that the children would testify at trial, as the State had previously conveyed.

¶ 11 Later in 2023, J.E.P. made an additional disclosure to her mother, and another forensic interview was conducted at the CAC by Sheryl Woodham. Based on the disclosures, additional charges were filed against the defendant, and on December 1, 2023, the State filed a motion

4

seeking to admit the additional statements made by J.E.P. to Roark and Woodham, pursuant to the hearsay exception set forth in section 115-10 of the Code. 725 ILCS 5/115-10 (West 2020).

¶ 12   On September 30, 2024, the trial court conducted a hearing on the motion. For Woodham's portion of the hearing, the State had previously tendered to the defense a forensic interview summary of Woodham's interview with J.E.P., dated February 15, 2023, and a video copy of the interview itself. The State indicated that it would be willing to proffer those statements for the purposes of the hearing.

¶ 13   The State then called Roark to testify. Roark testified that around January 16, 2023, she talked with J.E.P. and explained that she had an upcoming meeting with the State about the case. Roark told J.E.P. that if there was anything else she wanted to discuss or needed to share, this was the time to do so. J.E.P. then told Roark that the defendant "would put a movie on that would show them what to do to each other." After the movie ended, the defendant and J.E.P. would perform the act depicted in the movie. J.E.P. explained that the defendant "put his mouth on her private part" and she would put "her mouth on his private part." J.E.P. told Roark that there was also a time that the defendant tried to "put his private part in her private part," but it hurt J.E.P., so he stopped. J.E.P. said that she and the defendant did these sexual acts in his bedroom, in the shower, on the couch, and in his semi-truck. When asked how often these sexual encounters occurred, J.E.P. said that they would happen "a lot." After J.E.P. made the additional disclosure to Roark, the interview with Woodham was scheduled.

¶ 14   At the close of Roark's testimony, the trial court reserved its ruling on the State's motion until it could be determined whether the children would testify at trial, as was previously conveyed by the State. The court also reserved its determination of whether the time, content, and circumstances of J.E.P.'s statements provided sufficient safeguards of reliability.

5

¶ 15    The case proceeded to jury trial on October 28, 2024. At trial, both J.G.P. and J.E.P. testified. Following their testimony, Roark was called to testify. She testified that she is the mother of J.E.P. and J.G.P., and that at the time of trial they were under the age of 13. Roark explained that J.E.P. and J.G.P. regularly spent the night at the defendant's house and, around February 2020, they stopped wanting to spend the night and Roark would instead pick them up in the evening. Around this time, the defendant called Roark crying and upset, stating that he thought she was keeping J.E.P. and J.G.P. from him. Following this testimony, the court took a short recess, and, outside the presence of the jury, the State notified the trial court and the defense that it intended to next elicit testimony from Roark and Hankins-Hammond pursuant to section 115-10 of the Code.

¶ 16    The court noted that it had previously "found that the time, content, and circumstances of the two victims' hearsay statements," as testified to by Roark and Hankins-Hammond, "provided sufficient safeguards of reliability." Thus, because the victims had already testified and been subject to cross-examination, over the defense's objection, the court permitted Roark and Hankins-Hammond to testify pursuant to section 115-10 of the Code.

¶ 17    Roark then testified consistent with her proffered testimony on both April 18, 2022, and September 30, 2024. Following Roark's testimony, the State called Hankins-Hammond, who testified that she previously worked as an interviewer for the CAC. She stated that on May 26, 2020, she conducted a recorded forensic interview of J.E.P. and J.G.P. The interviews were admitted into evidence as People's Exhibits 1 and 2, and both exhibits were played for the jury.

¶ 18    Hankins-Hammond also testified that if a child made an additional disclosure of more abuse, it would be reasonable under their protocols to conduct an additional forensic interview. Hankins-Hammond also confirmed that in May of 2020, the CAC was backed up with cases due

6

to COVID restrictions and changing protocols. At one point, due to COVID, the CAC was not conducting interviews at all.

¶ 19    The following day, the State notified the trial court and the defense that it intended to next elicit testimony from Woodham pursuant to section 115-10 of the Code, and a hearing was conducted outside the presence of the jury. The State proffered a summary of Woodham's interview of J.E.P.

¶ 20    Woodham's summary stated that J.E.P. said that she and her sister would stay the night at the defendant's house while their mom was working. J.E.P. described the defendant as feeling like a member of the family. J.E.P. explained that one night when she was pretending to be asleep, she saw the defendant on top of her sister, J.G.P., similar to how he was on top of her. After seeing this, she and J.G.P. later discussed it in the bathtub.

¶ 21     J.E.P. said she did not remember the first time that the defendant touched her inappropriately but described incidents where the defendant touched her private area while in his semi-truck, on his couch, in his shower, and in his bed. J.E.P. explained that she and the defendant showered naked together. While in the shower on one occasion, the defendant picked her up and kissed her, putting his tongue on her tongue while attempting to put his penis in her vagina.

¶ 22    J.E.P. disclosed that the defendant put his tongue on and in her vagina two or three times. J.E.P. indicated that she was concerned that the defendant had messed something up with his tongue and that it may be the cause behind her peeing the bed. J.E.P. also disclosed an incident of oral sex between herself and the defendant. After the defendant showed J.E.P. a video of an adult woman putting her mouth on a man's penis, she put her mouth on the defendant's penis. J.E.P. said that she did not like putting her mouth on his penis and that it tasted weird, but she continued because he did not seem to mind when his tongue was on her vagina.

7

¶ 23    J.E.P. explained that other incidents occurred in the defendant's bed while J.G.P. was asleep on the other side of the bed, but that it had happened once on the couch. Both J.E.P. and the defendant would be naked, and he would be on top of her and rub his penis on her vagina. On some occasions, J.E.P. would be on top of the defendant, but he would always get back on top of her. J.E.P. said that every time he was on top of her, white stuff would come out, and he would catch it with his hand and go to the bathroom. However, sometimes, the white stuff got on her stomach. J.E.P. stated that the white stuff would come out every time he was on top of her, with the exception of an incident on the couch. J.E.P. also disclosed that sexual contact occurred in the defendant's semi-truck.

¶ 24    J.E.P. also described an incident where she and the defendant were almost caught. J.E.P. said that the defendant would lock his door, but one time, his daughter, Stormy, came into the house, and they hurried to get off each other. J.E.P. explained that they were still naked under the blanket, but she hid under the blankets and pretended to be asleep. J.E.P. disclosed that the defendant told her that if her mother ever found out, she would not be allowed back over at his residence.

¶ 25    The State then argued that J.E.P.'s statements met all of the necessary statutory safeguards and were admissible under section 115-10. Defense counsel, in response, stated: "Just, for the record, I would just object to the evidence being admitted. But I understand your argument. And, based on your prior rulings on admitting the other video, I believe that's probably not an unreasonable ruling." Defense counsel continued, citing that there was a delay in the disclosures, but stated that "the circumstances [were] at least consistent with what the statute intends." Defense counsel further argued that the time period between J.E.P.'s initial CAC interview and Woodham's interview gave rise to concerns about the statement's reliability and accuracy.

8

¶ 26    The trial court, before making its ruling, found that J.E.P.'s statements to Woodham, as proffered by the State, were very consistent with her testimony at trial and that there was not enough evidence to say that J.E.P.'s testimony was fabricated. The court acknowledged that it had some concern with the almost three-year delay between disclosures, but ultimately found that, considering the time, content, and circumstances of J.E.P.'s hearsay statements, there were sufficient safeguards of reliability.

¶ 27    Woodham testified that she is the executive director for the CAC and that she also serves as a forensic interviewer. On February 15, 2023, she conducted a recorded forensic interview of J.E.P., who was 10 years old at the time of the interview. The interview was admitted into evidence as People's Exhibit 5 and was played for the jury.

¶ 28    Following the testimony of additional witnesses, the jury returned a verdict finding the defendant guilty on all counts. Defense counsel then filed a motion for judgment notwithstanding the verdict or for new trial, arguing in part that the defendant was not proven guilty beyond a reasonable doubt, and that the trial court erred in allowing Roark to testify under section 115-10 of the Code.

¶ 29    On December 9, 2024, the defendant's motion for judgment notwithstanding the verdict or for new trial was heard before proceeding to his sentencing. The defense stood on the arguments presented in the motion, and the State argued that there was sufficient evidence to find the defendant guilty and that the court was correct in allowing Roark's testimony under section 115-10 of the Code. The trial court denied the defendant's motion.

¶ 30    As to the defendant's sentencing, the parties agreed that the court was statutorily required to sentence the defendant to seven consecutive terms of natural life in prison. See 720 ILCS 5/11-l.40(b)(1.2) (West 2020); 730 ILCS 5/5-8-1(a)(2.5), 5-8-4(d)(2) (West 2020). The court then

9

sentenced the defendant to seven consecutive terms of natural life in prison, followed by three years to life on mandatory supervised release. Thereafter, the defendant filed a timely notice of appeal on January 2, 2025.

¶ 31                              II. ANALYSIS

¶ 32    On appeal, the defendant contends that the trial court abused its discretion by admitting the hearsay statements that J.E.P. and J.G.P. made during their forensic interviews and in their disclosures to their mother, Roark. The defendant forfeited his claim related to the CAC interviews by failing to include it in his motion for a new trial. However, the defendant requests this court to review the alleged error as a matter of plain error and ineffective assistance of trial counsel.

¶ 33    In a prosecution for a physical or sexual act perpetrated upon or against a child under 13 years of age, section 115-10 of the Code allows the State to introduce the following testimony as an exception to the hearsay rule:

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(1), (2) (West 2020).

Such testimony shall only be admitted into evidence if:

> "(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

> (2) The child *** either:

10

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act

which is the subject of the statement[.]" *Id.* § 115-10(b)(1), (2)(A)-(B).

¶ 34   "The State, as the proponent of the out-of-court statements sought to be admitted pursuant to section 115-10 of the Code, bears the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation." *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009). "There are no precise tests for evaluating trustworthiness or reliability, but rather particularized guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the victim's statements." *People v. Rottau*, 2017 IL App (5th) 150046, ¶ 55 (citing *People v. West*, 158 Ill. 2d 155, 164 (1994); *People v. McMillan*, 231 Ill. App. 3d 1022, 1025 (1992)). "Important factors in determining reliability include the child's spontaneous and consistent repetition of the incident, the child's mental state, the use of terminology expected of a child of a similar age, and lack of motive to fabricate." *Id.* (citing *People v. Bowen*, 183 Ill. 2d 103, 120 (1998); *West*, 158 Ill. 2d at 164). In reviewing the trial court's reliability determinations, this court considers the evidence presented at the hearings held pursuant to section 115-10 of the Code, not the evidence presented at trial. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 85.

¶ 35   "A trial court has considerable discretion in admitting hearsay statements; therefore, a reviewing court will not disturb a trial court's decision absent an abuse of discretion." *Rottau*, 2017 IL App (5th) 150046, ¶ 55 (citing *People v. Zwart*, 151 Ill. 2d 37, 44 (1992)). A trial court abuses its discretion "when the trial court's determination is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court." *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 57 (citing *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

11

¶ 36                          1. The Disclosures to Roark

¶ 37    The defendant asserts that the trial court's findings were unreasonable because the victims' disclosures "were the result of parental pressure, adult intervention, and dishonesty." The defendant argues that neither J.E.P.'s nor J.G.P.'s statements to Roark were spontaneous; instead, they were "elicited through continued pressure and trickery," and that J.E.P.'s statements were inconsistent. We disagree.

¶ 38    The trial court carefully considered the time, content, and circumstances of the minor children's statements and found that their statements were sufficiently reliable to warrant admission. Although the initial disclosures to Roark were made in response to her inquiry, the circumstances suggest that the disclosures were initiated by the children themselves. Roark testified that she overheard the girls in the bathtub whispering to each other, which was unusual considering the children's normal playfulness in the bathtub. Roark then said to the girls, "Mommy already heard what you were saying. So just tell me what you're talking about." After that statement, J.G.P. told Roark that the defendant "puts his private part on her private part." Roark's statement to the children indicates that the topic of the defendant's inappropriate contact was not the result of her adult questioning and it did not introduce any sexual content; rather, the statement prompted clarification about what the girls were already discussing.

¶ 39    While J.G.P. disclosed the inappropriate contact immediately and J.E.P. initially denied involvement, their differing reactions do not undermine reliability. As we acknowledged in *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 251, some children may be unwilling to discuss their own traumatic experience involving sexual contact, and it is not unreasonable for a trial court to determine that statements and questions asked to the children are necessary for the child to overcome their reluctance.

12

¶ 40    Here, nothing in the record suggests that the statement by Roark was unduly suggestive or coercive, and J.E.P.'s response was in her own words. Roark testified that she told J.E.P. that she called the defendant and that he told Roark what J.G.P. "had said was true and that it's okay for [J.E.P.] to tell [Roark]." This statement from Roark prompted J.E.P. to say "yeah, Mommy, he does that to me, too." Roark did not discuss or suggest that J.E.P. and the defendant were touching private parts; she did not discuss the white or sticky stuff coming out of the defendant's penis, nor did Roark suggest that the defendant told J.E.P. that he would not be able to see her again if she told. The fact that Roark had to reassure J.E.P. to encourage her to be more candid is understandable in light of her age. *People v. Edwards*, 224 Ill. App. 3d 1017, 1031 (1992) ("It is entirely unrealistic to expect a child to speak about such topics in the course of casual conversation."). Moreover, Roark's testimony was consistent with the testimony of the CAC interviews regarding the disclosures of both children. Thus, considering the totality of the circumstances, we cannot say that the trial court abused its discretion in allowing the admission of J.E.P. and J.G.P.'s statements to Roark under section 115-10 of the Code.

¶ 41                              2. The CAC Interviews

¶ 42    The defendant acknowledges he has forfeited the issues related to the CAC interviews in his brief. While the defendant objected to the admission of the victims' statements in their CAC interviews during the section 115-10 hearings, as well as during the jury trial, he failed to reference these arguments in his motion for a new trial. The defendant requests that this court review the alleged errors as a matter of plain error and for ineffective assistance of trial counsel. It is well settled that failure to offer both a contemporaneous objection and raise the issue in a posttrial motion results in forfeiture. *People v. Johnson*, 218 Ill. 2d 125, 138 (2005). Therefore, as the defendant notes, the issues are forfeited. Forfeited issues can only be reviewed if a defendant can

establish plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 43    Under the first prong of the plain error doctrine, the defendant bears the burden of establishing that a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Under the second prong, the defendant bears the burden of persuading the court that the alleged error was so serious that it denied a substantial right, such as the right to a fair trial by an impartial trier of fact. *Id.* at 613-14. Under either prong, the first step is determining whether a clear or obvious error occurred. *Id.*

¶ 44    Alternatively, the defendant argues that defense counsel was ineffective for failing to argue in his motion for a new trial that the trial court abused its discretion by admitting the hearsay statements that J.E.P. and J.G.P. made during their forensic interviews. "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).

¶ 45    As noted above, section 115-10 of the Code provides an exception to the hearsay rule for certain out-of-court statements made by child victims concerning sexual acts or conduct. 725 ILCS 5/115-10 (West 2020). The statute requires the trial court to determine whether "the time, content, and circumstances of the statement provide sufficient safeguards of reliability," and whether the child testifies or is otherwise unavailable as required. *Id.* § 115-10(b)(1); *Bowen*, 183 Ill. 2d at 115. The admission of such statements is reviewed for an abuse of discretion. *People v. Williams*, 193

14

Ill. 2d 306, 352 (2000). An abuse occurs only where the decision is arbitrary, fanciful, or unreasonable. *Id.*

¶ 46    The defendant argues that the CAC interviews were unreliable due to parental pressure, their motive to fabricate, and inconsistencies between interviews. However, as discussed above, the record demonstrates that the trial court conducted the required hearing and determined that the time, content, and circumstances of the victims' statements provided sufficient safeguards of reliability. See 725 ILCS 5/115-10 (West 2020).

¶ 47    Here, both J.E.P.'s and J.G.P.'s interviews were professionally conducted forensic interviews that took place shortly after each of the disclosures. Nothing in the record suggests that the CAC interviews were unreliable due to parental pressure. The interviews were conducted with open-ended questions, and the children were able to describe events without prompting, which demonstrated that their answers originated from internal memory rather than suggestion.

¶ 48    During the interviews, the children described similar acts, locations, patterns of behavior, and sequences of events. During the interviews, the children demonstrated anatomical and physiological knowledge well beyond what would be expected for their ages, even if they had seen their mother having sex on one occasion. Both girls described the mechanics of the defendant's acts and their bodily sensations. J.E.P., in her second interview, when she was 10 years old, described the presence of ejaculatory fluids on her body. Moreover, both victims testified at trial and were subject to cross-examination.

¶ 49    While J.E.P.'s second disclosures occurred almost three years after her initial disclosure, her disclosures are not inherently unreliable due to their timing. See *Zwart*, 151 Ill. 2d at 46 (finding that delays in reporting abuse or initial denials of abuse will not automatically render a victim's statements inadmissible under section 115-10). Rather, J.E.P.'s later disclosures expanded

15

upon her earlier statements and provided additional details. Accordingly, we find nothing in the record to support the conclusion that the trial court abused its discretion by admitting the CAC interviews. Where there is no error, there can be no plain error. *People v. Bannister*, 232 Ill. 2d 52, 71 (2008).

¶ 50 Because, as set forth above, we find no errors on behalf of the trial court in the admission of the victims' CAC interviews, we decline to address the defendant's argument regarding ineffective assistance of counsel. Where the defendant fails to establish that any clear or obvious error occurred, he cannot establish plain error or ineffective assistance of counsel. See *People v. White*, 2011 IL 109689, ¶ 134; *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 51 III. CONCLUSION

¶ 52 For the above reasons, we affirm the defendant's convictions.

¶ 53 Affirmed.